**Timothy F. DASSOW, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 411–82.**

Court of Criminal Appeals of Texas, En Banc.

March 1, 1983.

Gerald W. Guerinot, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and Timothy G. Taft, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## ON DENIAL OF STATE'S PETITION FOR DISCRETIONARY REVIEW

McCORMICK, Judge, dissenting.

Appellant was convicted of murder and his punishment was assessed at twenty-five years. The Houston Court of Appeals, First Supreme Judicial District, in an unpublished opinion, reversed the conviction on the ground that the trial court erred in failing to charge the jury on the lesser included offense of voluntary manslaughter. *Dassow v. State*, No. 01–81–0627–CR (March 18, 1982).

For a summary of the facts and evidence, I quote from the opinion of the Court of Appeals:

"The appellant and his friend, Larry Chapa, were inside a house located at 6314 North Main Street, Houston, Texas. Apparently, three men, Larry Chapa, Edgar Beaulieu, and Albert Spinnenweber, had been renting the home and living there. They were all acquainted with the appellant.

"Ill-will developed among the appellant, Edgar Beaulieu, and Albert Spinnenweber. The men had been accusing each other of stealing each other's possessions.

"The appellant maintains that he moved into the house on August 18, 1980. He had paid rent to the owner of the house on August 21st and 23rd. The appellant and Larry Chapa were in the house when Albert Spinnenweber and the deceased, Edgar Beaulieu, returned home at about 7:30 p.m. on August 24.

"Albert Spinnenweber testified that when he and the deceased entered the house, the appellant jumped up and pointed the rifle at them. Spinnenweber gave the following account of the incident which lead up to the shooting:

"Q. (By the Prosecutor) Okay. What did you say to the defendant?

"A. Told him to get the f____ out of the house.

"Q. You said it just like that?

"A. Just like that.

"Q. What did Edgar say, if anything?

"A. He said the same thing.

"Q. What was the defendant doing this entire time?

"A. Still holding the gun on us, and after we told him to get the f____ out of the house, he said: No. You get the f____ out.

" * * *

"Q. After you and Edgar told him to get the f____ out of there, and after he told you the same, what happened, if anything?

"A. We started arguing back and forth.

"Q. What was the closest that you or Eddie got to this defendant while ya'll were standing in the living room?

"A. Fifteen foot.

"Q. Okay. At any time did you decide to leave the premises.

"A. As soon as he threw the gun down on us.

"Q. What did you say at that time, if anything?

"A. I grabbed a hold of Eddie's left arm, and I said: Come on Eddie. Let's just get out of here.

"Q. What did Eddie say, if anything?

"A. He threw his arms up like this, and said: F____, no. This is our house. We live here.

"Q. Do you know whether or not Eddie had been drinking?

"A. Yes, he had been.

"Q. Did you ever hear him threaten the defendant besides saying: F____ you. It's my house. Did he ever say: I'm going to kill you, or I'm going to hurt you?

"A. No, he did not.

"Q. Did he ever advance toward the defendant?

"A. No, he did not.

"Q. What happened after Eddie threw up his hands and you were trying to go outside, if anything?

"A. Then he shot.

" * * *

"The appellant testified to a different version of the argument which led up to the shooting:

"Q. (By the Defense Attorney) What happened? Tell the ladies and gentlemen of the jury what happened when Albert Spinnenweber and Edgar Beaulieu came through the door?

"A. (By the Appellant) Well, at first, I heard a knock, and I was about half asleep. So I woke up, and the door catches on the corner. They had to use force, you know, to push it open. They had unlocked the door.

" * * *

"Q. After they came in, what happened?

"A. Well, there was an argument.

"Q. Between who?

"A.  Between Edgar Beaulieu and Albert Spinnenweber and me.

"Q.  Okay.  Tell the ladies and gentlemen on the jury what the argument was about.

"A.  It was about who had possession of the house.

"Q.  Did you ever tell these people that you had paid rent to live there?

"A.  No, I hadn't.

"Q.  Did they ever ask you?

"A.  No, they didn't.

"Q.  What did they tell you?

"A.  Told me to get the F out of there.

"Q.  Did you tell them you were going to leave, or you weren't going to leave?

"A.  I told them I wasn't going to leave, because I paid rent.

"Q.  All right.  How far apart were you and Edgar and Albert at that time?

"A.  Twelve feet, fifteen feet.

"Q.  Okay.  Did you have your gun at that time?

"A.  I had picked it up yes, when the argument started.

"Q.  What did Albert Spinnenweber do?

"A.  He went into the bedroom.

"Q.  What did Edgar Beaulieu do?

"A.  He remained by the door, still using obscenities toward me.

"Q.  Where was Albert during the shooting?

"A.  He was in the bedroom.

"Q.  What did Edgar do prior to you shooting him?

"A.  Made threats that he wasn't afraid of me or the gun, and he said he was going to do something to me.

"Q.  What exactly did he say.

"A.  He was going to kill me.

"Q.  Did he remain standing at the door, or did he do anything at that point?

"A.  No, he took two steps toward me, reaching behind his back, and I tried to fire and scare him.  I hit him.

"Q.  At any time did you intend to kill him?

"A.  No, I didn't.

"Q.  After the shooting, where did you go?

"A.  Well, I left.  I went and got in my car and drove off, I was real nervous.  I went to the Salases, some friends of mine, who called Homicide, and told them what happened, that I would be down.

" * * *

"Q.  When Edgar Beaulieu came towards you and had his hand behind his back, what were you thinking at that time?

"A.  I thought he might have a gun similar to that revolver or something behind his back.  He was going to carry out his threats with it.

"Q.  Were you afraid of him?

"A.  Yes, I was.

"Q.  Was Edgar a small man or a big man?

"A.  He was a fairly large man."

The Court of Appeals concluded that appellant's testimony was sufficient to raise the issue that the appellant acted under the influence of sudden passion and that a charge on voluntary manslaughter should have been submitted to the jury.  The State contends that appellant's testimony that he did not intend to kill the deceased is a specific denial by appellant that he was guilty of voluntary manslaughter and thus appellant was not entitled to such a charge.

Before a defendant is entitled to a charge on a lesser included offense, there must be evidence that, if guilty, he is guilty only of the lesser offense.  *Royster v. State,* 622 S.W.2d 442 (Tex.Cr.App.1981).  As I perceive the testimony in the instant case, appellant denied the existence of any culpable mental state.  Having denied the required culpable mental state, no error is shown in the court's failure to charge on voluntary manslaughter.  In *Daniels v. State,* 633 S.W.2d 899 (Tex.Cr.App.1982), this Court held that, where a defendant denied he had the required culpable intent, a charge on the lesser included offense is not required.  See also *Lindsey v. State,* 608 S.W.2d 230 (Tex.Cr.App.1980).

I would grant the State's petition for discretionary review, reverse the judgment of the Court of Appeals, and affirm the

judgment of the trial court. To the majority's failure to do this, I dissent.

W.C. DAVIS, and CAMPBELL, JJ., join in this dissent.